**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE S. GORE, | ) | CASE NO. 5:20-cv-341 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, George S. Gore, ("Plaintiff" or "Gore"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying  his applications for

a Period of Disability ("POD"), and Disability Insurance Benefits ("DIB") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").   This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).   This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.   For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

In April 2016, Gore  filed an application for POD and DIB, alleging a disability onset date of November 30, 2015[2] and claiming he was disabled due to glaucoma, blindness in the left eye, and depression.  (Transcript[3] ("Tr.") at 182.)   The applications were denied initially and upon reconsideration, and Gore requested a hearing before an administrative law judge ("ALJ").  (Tr. 30.)

On  February 1, 2019, an ALJ held a hearing, during which Gore, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 30.)  On February 13, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 25.)  The ALJ' s decision became final on December 17, 2019, when the Appeals Council declined further review.  (Tr. 1.)

On February 14, 2020, Gore filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 21.) Gore asserts the following assignment of error:

(1)    The ALJ's decision should be reversed because the ALJ failed to properly evaluate the opinions provided by Mr. Gore's treating physician.

(2)    Mr. Gore is disabled under SSR 85-15 because he is closely approaching retirement age and his severe, medically determinable impairments prevent him from performing past relevant work.

(Doc. No. 21 at 2, 14.)

---

[2]    Gore's attorney at the hearing requested and received permission to amend the alleged onset date to June 11, 2015. (Tr. 15.)

[3]    There were two Transcripts filed in this case.  All references herein are to the Corrected Transcript filed by the Commissioner on August 17, 2020.  (Doc. No. 16.)

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

Gore was born in 1953 and was sixty-five years-old at the time of his administrative hearing, making him an individual closely approaching retirement age under social security regulations.  (Tr. 24.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a truck driver.  (*Id.* at 57.)

**B.    Relevant Medical Evidence[4]**

**1.        Mental Impairments**

No mental impairments are at issue in this case.

**2.        Physical Impairments**

In 2007, Gore was diagnosed with advanced glaucoma and loss of most of the vision in his left eye.  (*Id.* at 305.)

In 2008, Gore had surgery in his left eye, but he unfortunately lost most of the vision in that eye and could only count fingers. (*Id.*)

In 2009, Gore was scheduled to have a trabeculectomy in his right eye but the surgery was abandoned because he developed a periorbital hemorrhage during the procedure. (*Id.* at 292.)

On February 14, 2011, Gore met with Dr. John Antalis, M.D., for a follow up appointment to discuss his glaucoma and treatment options. (*Id.* at 272.)  Dr. Antalis prescribed Travatan and Cosopt to treat the glaucoma symptoms, but these medications did not sufficiently reduce Gore's intraocular pressure.  (*Id.*)  Dr. Antalis recommended a trabeculectomy for his right eye. (*Id.*)

---

[4]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

On January 17, 2012, Gore had surgery on his right eye.  (*Id*. at 278.)  Dr. Antalis attempted to perform a trabeculectomy with mitomycin, but there were complications.  (*Id*.)  Dr. Antalis inadvertently tore into the scleral flap and had to abort the trabeculectomy for fear of causing hypotony in Gore's only good seeing eye.  (*Id*. at 278, 282.)  Dr. Antalis told Gore that he would attempt the surgery again in six months.  (*Id*. at 282.)

On January 22, 2013, Gore had a trabeculectomy on his right eye. (*Id*. at 292.) Scar tissue from the prior failed procedure was present. (*Id*. at 293.)  Dr. Antalis noted that he had "really struggled with getting his right eye taken care of, but fortunately [the] surgery went great." (*Id*. at 294.)

On February 7, 2013, Dr. Antalis treated Gore for "a wound leak, low pressure and . . . developing choroidal detachments" in his right eye. (*Id*. at 298.) Dr. Antalis anticipated that Gore would be able to return to work in March. (*Id*. at 306.)

On April 29, 2013, Dr. Antalis noted that Gore had 20/25+2 visual acuity with a pressure of 9 in his right eye, was off medicine, had returned to work, and "hopefully will do well (long term)." (*Id*. at 314.)

On June 2, 2014, Dr. Antalis noted that Gore's right eye had developed a cataract , reducing his vision in that eye to 20/50. (*Id*. at 323.)

On July 8, 2014, Gore had cataract extraction surgery and a lens implant in his right eye. Tr. 325.  He had 20/30 uncorrected vision in his right eye shortly after the procedure. (*Id*. at 326.)

On September 8, 2014, Gore had a follow up appointment after losing his job because he failed to pass his DOT physical due to his vision loss, likely because of field loss in his right eye. (*Id*. at 331.)  Dr. Antalis' examination revealed Gore's right eye had 20/20 corrected vision, but was

4

experiencing "some field loss." (*Id*.)  Gore realized that he would no longer be able to be a truck driver because of his impairment. (*Id*.)  Dr. Antalis told Gore that this was safer for him, because he should not be driving. (*Id*.)

On May 5, 2015, Dr. Antalis wrote a medical source opinion about Gore's impairments. (*Id*. at 344.)  Gore was diagnosed with primary open angle glaucoma, with a "reasonably good" prognosis for the right eye, and "very poor" for the left eye. (*Id*.)  Dr. Antalis noted that medication had controlled eye pressures, but vision was never restored in the left eye and the right eye has significant visual field loss. (*Id*.)  He opined that Gore should not be driving for work, should not be operating heavy machinery, and should not do anything requiring fine detail or risk of using dangerous equipment, but "is able to do most other activities of daily living without limitations." (*Id*. at 345.)

On February 2, 2016, Dr. Antalis completed a medical source statement. (*Id*. at 391.)  He noted that Gore's left eye had "essentially no periph[eral] field" vision, and that his right eye had "moderate nasal and temporal [vision] loss." (*Id*.) Dr. Antalis explained that Gore's depth perception was very poor, that he had fallen on steps, feels unsafe driving long distances or at night, and that he is sometimes startled by things, mostly people, because he doesn't see them when he is moving. (*Id*.) He opined that Gore should not perform work involving depth perception, accommodation, or field of vision. (*Id*. at 392.)  He opined that Gore could not avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles, and had difficulty ascending or descending stairs, but could work with small or large objects.  (*Id*.)  He also opined that Gore should not drive for work, operate heavy machinery, or do any dangerous tasks because of his vision. (*Id*. at 393.)

5

On May 16, 2016, in a letter to the Ohio State Division of Disability Determination,  Dr. Antalis opined that Gore had essentially almost completely lost vision in his left eye because of advanced glaucoma, and that he had significant field loss in his right eye, which ended his career as a truck driver. (*Id*. at 337.)

On June 16, 2016, Gore met with an Ohio State Division of Disability Determination consultative examiner, Mary File, M.D. (*Id*. at 355-58.)  She performed a physical exam showing the vison in his left eye was worse than 20/400, and vision in his right eye was 20/25 without correction and 20/20 with correction. (*Id*. at 355.)  She found some reduction in his temporal and nasal peripheral vision in his right eye, but determined that Gore retained a field of 35 degrees or more in all directions. (*Id*. at 356.) Dr. File diagnosed Gore with open angle glaucoma. (*Id*.) She opined that he should not climb heights, operate heavy machinery or drive commercially. (*Id*.)

On August 29, 2016, Gore reported in his Functional Report for the Social Security Administration that he could not avoid bumping into objects at home. (*Id*. at 226.)  He reported that he could "slowly make simple meals like coffee and toast," and perform daily tasks like cleaning and vacuuming, but all "with poor results usually" because he cannot see well. (*Id*. at  227-28.) He reported that his wife did most of the driving, and that he could drive short distances with his wife accompanying him.  (*Id*. at 229.)  He reported that he had tripped over things around the house, causing "several falls," and had "even more close calls."  (*Id*. at 230.)  He reported that he was almost hit by children riding their bicycles because he could not see them well enough to step out of their way while walking.  (*Id*.)  He reported that he had difficulty reaching for objects, avoiding simple objects around him when walking, and that it was difficult to navigate stairs or uneven ground without tripping or falling.  (*Id*. at 231.)  He reported that it had become "hard to get simple things

done timely" because he had to do them more carefully due to his vision loss.  (*Id*.) He reported that he could not avoid things on the floor, and sometimes could not avoid walking into doors or doorways.  (*Id*.)  He reported that he had many instances of not being able to avoid objects in public such as walking into food carts in parking lots. (*Id*.)

On October 3, 2016, Gore reported to Dr. Antalis that his peripheral field of vision had worsened. (*Id*. at 367.) Dr. Antalis noted that Gore drove to the appointment.  (*Id*.)  He continued to have 20/25 uncorrected and 20/20 corrected vision in his right eye. (*Id*. at 367-71.)

On May 18, 2017, Gore called Dr. Antalis to report that his visual acuity and color perception were "much improved." (*Id*. at 363.)  An examination on May 24, 2017 confirmed that the corrected vision in his right eye continued to be 20/20. (*Id*. at 363-66.)

On August 23, 2018, Gore reported to Ari Yoder, O.D., that he continued to see well out of his right eye. (*Id*. at 383.)  His corrected vision was rated 20/20 in his right eye. (*Id*. at 384.)  Dr. Yoder noted that Gore's lids were normal, his lashes were clean, his puncta were open, his lacrimal glands showed no plugging, and his anterior chamber was clear.  (*Id*. at 385.) His replacement lens was also clear. (*Id*. at 386.)

On November 14, 2018, Dr. Antalis completed a medical source statement. (*Id*. at 388.) He opined that Gore's vision had progressively worsened since his glaucoma and cataract surgery in 2013 and 2014 respectively, and that "[t]hese surgeries have helped maintain his vision, but have caused gradual loss of depth perception, light sensitivity, difficulty driving and… seeing objects (like cars)." (*Id*.)

7

### C.     State Agency Reports

#### 1.     Mental Impairments

On June 21, 2016, state agency reviewing psychologist Robyn Murry-Hoffman, Ph.D. opined that Gore had affective disorders which caused mild difficulties in maintaining concentration, persistence, or pace. (Tr. 72.)

On September 21, 2016, state agency reviewing psychologist Jennifer Swain, Psy.D., concurred with the prior opinion. (*Id*. at 86.)

#### 2.     Physical Impairments

On June 23, 2016, state agency reviewing physician Dr. Michael Delphia opined that Gore had limited visual acuity, accommodation, color vision, and field of vision in his left eye, and limited depth perception in both eyes. (Tr. 71, 74.) He opined Gore should avoid all exposure to climbing heights, operating heavy machinery or driving commercially. (*Id*. at 74-75.)

On September 23, 2016, the state agency reviewing physician Dr. Maria Congbalay affirmed Dr. Dephia's findings, and also opined that Gore could never climb ladders, ropes or scaffolds. (*Id*. at 88-90.)

### D.     Hearing Testimony

During the February 1, 2019 hearing, Gore testified to the following:

- He is 65 years old, and lives in Newcomerstown, Ohio with his wife and their cats. (Tr. 37.)

- His home is two stories, and he sleeps in the living room because he has had "a couple of close calls" on the stairs, and now avoids them. (*Id*. at 38.)

- His wife drove him to the hearing, and does most of the driving. He can't drive at night, because he has issues with glare. He has a driver's license, but it is restricted. (*Id*. at 39.)

8

- He completed high school and a year of vocational training at Kent State.  He was a truck driver for his entire working life.  (*Id*. at 40.)

- He drove double-trailer trucks, and also worked the dock, loading and unloading freight using a forklift or cart.  (*Id*. at 41.)

- The primary condition limiting his ability to work is blindness in his left eye.  (*Id*. at 42.)

- He has no other physical conditions affecting him, and his depression arose from the stress of his disability, inability to work, and debt.  (*Id*. at 43-4.)

- He was volunteering at a food bank, helping load cars with food, but had to stop after fourteen months because he had "people in cars come awfully close" and he wasn't aware of the danger.  (*Id*. at 46.)

- He also has issues with depth perception, leading to a couple of falls on the stairs.  (*Id*.)

- He can read at a slower pace than before, but can't read on screens for very long.  (*Id*. at 47-8.)

- He still cuts the grass, but it takes him twice as long as it used to.  (*Id*. at 48.)

- He can wash the car, but more slowly than he used to.  (*Id*. at 49.)

The VE testified Gore had past work as a truck driver.  (*Id*. at 57.)  The ALJ then posed the following hypothetical question:

> The first hypothetical individual has non-exertional limitations only.  This individual could never climb ladders, ropes, or scaffolds.  Only occasionally client [sic] ramps and stairs.  Now, he is blind in the left eye, so peripheral vision, depth perception isn't limited, but with otherwise normal vision in the right eye.  So he can work with both large, and small objects.  And, he could avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching vehicles, or people.  Now, this individual would need to avoid concentrated exposure to very great lights.  You can define that as greater than a typical office setting.  And, his workstation should be inside to avoid sun glare.  He should avoid all exposure to hazards such as unprotected heights, moving mechanical parts, any operation of motor vehicles.  Would that hypothetical individual be able to perform claimant's past relevant work?

(*Id*. at 57-8.)

9

The VE testified the hypothetical individual would not be able to perform Gore's past work as a truck driver.  (*Id*. at 58.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as laundry worker, stock clerk, and housekeeping cleaner.  (*Id*.)

Next the ALJ asked the VE to consider an individual with the same limitations as in the first hypothetical, and the added limitation that he could occasionally climb ramps, but never climb stairs. (*Id*. at 59.)

The VE testified that this hypothetical individual could perform most medium level exertion jobs, although the housekeeper cleaner job would be excluded.  (*Id*.)  Other representative jobs the second hypothetical individual could perform include room packager, mail room clerk, and produce sorter.  (*Id*.)

Next the ALJ asked the VE to consider an individual with the same limitations as in the first or second hypothetical, and the added limitation that the hypothetical individual was unable on his own to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles.  (*Id*. at 59-60.)

The VE testified that adding these limitations to either hypothetical would preclude competitive employment in any light or medium exertion jobs because that hypothetical individual cannot work in an environment with any workplace hazards.  (*Id*. at 60.)

Gore's counsel asked the VE whether, considering Gore's age and work history, there was any difference on his employability between him having an eleven or twelfth grade education.  (Tr. 62.)  The VE testified that there was no difference.  (*Id*.)

10

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent

11

him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Gore was insured on his alleged disability onset date, June 11, 2015, and remains insured through June 30, 2019, his date last insured ("DLI.")  (Tr. 17.)  Therefore, in order to be entitled to POD and DIB, Gore must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.

2. The claimant has not engaged in substantial gainful activity since June 11, 2015, the amended alleged onset date.

3. The claimant has the following severe impairments: Blindness in the Left Eye Secondary to Glaucoma, Glaucoma of the Right Eye, Status-Post Trabeculectomy of the Eyes Bilaterally, Presence of Intraocular Lens Status-Post Cataract Extraction and Lens Implant in the Right Eye, Presbyopia of the Right Eye, Anisometropia.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can never climb ladders, ropes or scaffolds, but can occasionally

12

climb ramps and stairs.  The claimant is blind in the left eye, so the claimant's peripheral vision and depth perception are limited with otherwise normal vision in the right eye.  The claimant can work with both large and small objects and can avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, approaching vehicles and people.  The claimant must avoid concentrated exposure to very bright lights (brighter than the typical office setting) and his workstation should be inside to avoid sun glare.  The claimant should avoid all exposure to hazards such as unprotected heights and moving mechanical parts.  The claimant should avoid the operation of motor vehicles.

6.     The claimant is unable to perform any past relevant work.

7.     The claimant was born July **, 1953, and was 62 years old, which is defined as an individual closely approaching retirement age, on the alleged disability onset date.

8.     The claimant has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 11, 2015, through the date of this decision.

(Tr. 17-25) (citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, ,424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572

F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence,

14

however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      First Assignment of Error: Opinions of The Treating Physician

Gore's first assignment of error asserts that the ALJ's decision should be reversed because the ALJ failed to properly evaluate the opinions provided by Mr. Gore's treating physician, Dr. Antalis.[5]  (Doc. No. 21 at 1.)  He argues that the ALJ failed to properly apply the controlling weight test to Dr. Antalis' opinions because he failed to provide good reasons for not giving those opinions controlling weight.  (*Id*. at 6.)

The Commissioner responds that Gore's argument rests on his disagreement with the ALJ's

---

[5]      It is uncontested bu both the parties and the ALJ that Dr. Antalis qualifies as a treating source under the regulations.

15

weighing of the evidence, which is not a sufficient basis for setting aside the ALJ's factual findings. (Doc. No. 23 at 9.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[6] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. §

---

[6]  Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017). The claim at issue in this case was filed in April 2016. (Tr. 182.)

[7]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

16

404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner    such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors    [the ALJ]

17

decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 F. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.,* 561 F. App'x 464, 471 (6th Cir. 2014).

In this case, Dr. Antalis offered multiple opinion statements over a period of years, beginning in May 2015 and ending in November 2018, all of which were addressed in the ALJ's February 2019 decision.[8] Although Gore asserts that the ALJ failed to properly apply the controlling weight test to these opinions, this appears to be based on the misconception that the ALJ is required to articulate specific findings as to each of the factors listed at 20 CFR §404.1527. (Doc. No. 21 at 6.) Neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. Mar. 16, 2011). In his decision, the ALJ identified Dr. Antalis as a treating source, and discussed the consistency of his opinions with the treatment notes and other substantial record evidence, two of the factors listed at 20 CFR §404.1527. Therefore, the ALJ properly considered all of Dr. Antalis' opinions as treating source opinions.

### i. May 2015 Opinion

On May 5, 2015, Dr. Antalis wrote a medical source opinion in relation to about Gore's state disability claim. (Tr. 344.) He explained that Gore had been his patient since 2007, and was treated was for primary open angle glaucoma, with a "reasonably good" prognosis for the right eye,

---

[8] In his Brief, Gore makes specific assertions about the ALJ's treatment of Dr. Antalis' May 2015, February 2016 and May 2016 opinions. Therefore, those are addressed in greater detail below. Dr. Antalis also rendered an opinions in November 2018, but because Gore does not address this opinion in his brief, it will not be further discussed herein.

18

and "very poor" for the left eye. (*Id*.)  Dr. Antalis explained that medication had controlled Gore's

eye pressures, but vision was never restored in the left eye and the right eye has significant visual

field loss. (*Id*.)  He opined that Gore should not be driving for work, should not be operating heavy

machinery, and should not do anything requiring fine detail or risk of using dangerous equipment,

but "is able to do most other activities of daily living without limitations." (Tr. 345.)

> The ALJ addressed Dr. Antalis' May 2015 opinion as follows:

> In a medical opinion dated May 2015, John Antalsi, M.D., the claimant's treating
> physician, opined that the claimant should not operate a motor vehicle, heavy
> machinery or hazardous machinery.  He should not engage in fine detail work.  He
> was able to do most other activities of daily living without limitations such as
> walking, sitting, standing, hearing and lifting.  I give this opinion some weight and
> do not give it controlling weight.  The opinion predated the amended onset date,
> which detracted from its analytical value.  However, the limitations discussed are
> consistent with the claimant's reduced visual field in his right eye and blindness
> in his left eye.

(Tr. 21.)

Gore asserts that the ALJ erred when discounting this opinion solely because it occurred

one month before the alleged onset date of disability.  (Doc. No. 21 at 8.)  In support of this

assertion, he cites three cases.   In the first, the ALJ assigned little weight to a medical opinion that

predated the alleged onset date by two years, and the court found that the ALJ articulated good

reasons for doing so, including the date of the opinion, the fact that the physician was opining on an

area outside of his professional expertise, and the lack of support in the medical evidence for the

limitations in the opinion.  *Woodruff v. Comm'r of Soc. Sec*., No. 2:13-CV-0224, 2013 WL 6513352,

at *6 (S.D. Ohio Dec. 12, 2013), *report and recommendation adopted*, No. 2:13-CV-0224, 2014 WL

116384 (S.D. Ohio Jan. 10, 2014).  The next case held that an opinion which predated the alleged

onset date by three years was not relevant.  *Shackleford v. Comm'r of Soc. Sec*., No. 2:12-CV-398,

19

2013 WL 2468171, at *12 (S.D. Ohio June 6, 2013), *report and recommendation adopted sub nom.*

*Shackleford v. Colvin*, No. 2:12-CV-398, 2013 WL 4039035 (S.D. Ohio Aug. 7, 2013).  In the final

case, the ALJ failed to address a medical opinion rendered a year prior to the alleged onset date.

*Kimbleton v. Comm'r of Soc. Sec.*, No. 2:10-CV-559, 2011 WL 3566187, at *11 (S.D. Ohio Feb. 1,

2011), *report and recommendation adopted*, No. 2:10-CV-559, 2011 WL 3584471 (S.D. Ohio Aug.

15, 2011) ("It is not clear, however, why a June 28, 2004 consultative examination which might

support the proposition that a claimant was disabled due to degenerative joint disease earlier than

her alleged onset of August 15, 2005 would not be medical evidence of record which an ALJ should

consider.")

     In contrast, the Commissioner cites authority which explains that, to be given significant

weight, a treating physician's opinion must be supported by "relevant, objective evidence that was

contemporaneous to the insured period."  *Stark v. Comm'r of Soc. Sec.*, No. 5:15-CV-477, 2016 WL

1077100 at *6. (N.D. Ohio Mar. 18, 2016.)  An opinion rendered prior to the alleged onset date must

necessarily be supported by evidence that is not contemporaneous to the date of disability.

     In this case, the ALJ did address the May 2015 opinion, and his determination that the fact

it predated the alleged onset date limited its analytical value is consistent with both relevant authority

and with the undisputed proposition that Gore's visual acuity has changed over time. These are

"good reasons" for his decision to accord the opinion "some weight." Further, the May 2015 opinion

is consistent with the restrictions in the ALJ's decision,[9] which stated that "The claimant should

avoid all exposure to hazards such as unprotected heights and moving mechanical parts.  The

---

[9]    Gore does not explain how giving this opinion "controlling weight" would have
altered the ALJ's decision.

claimant should avoid the operation of motor vehicles." (Tr. 20.) Therefore, the ALJ did not err in his treatment of this opinion

### ii.    February 2016 Opinion

On February 2, 2016, Dr. Antalis completed a second medical source. (Tr. 391.) He noted that Gore's left eye had "essentially no periph[eral] field" vision, and that his right eye had "moderate nasal and temporal [vision] loss." (*Id*.)  Dr. Antalis explained that Gore's depth perception was very poor, that he had fallen on steps, feels unsafe driving long distances or at night, and that he is sometimes startled by things, mostly people, because he doesn't see them when he is moving. (*Id*.)  He opined that Gore could not perform work involving depth perception, accommodation, or field of vision, but could frequently perform work activities involving near and far acuity. (Tr. 392.)  He opined that Gore could not avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles, and had difficulty ascending or descending stairs, but could work with small or large objects.  (*Id*.)  He also opined that Gore should not drive for work, operate heavy machinery, or do any dangerous tasks because of his vision. (Tr. 393.)

> The ALJ addressed Dr. Antalis' February 2016 opinion as follows:
>
> [The opinion] overstated the claimant's impairments. The record did not support the assertion that the claimant was unable to avoid normal hazards using the vision in his right eye. He engaged in public life and was able to complete household tasks such as cooking, caring for his pets, and driving despite his impairments. The claimant testified that he was able to traverse stairs (Testimony; 7E). However, the treatment record demonstrated that the claimant's depth perception and field of vision were impaired. Because this opinion was partially consistent with the opinion, I give it some weight. (2F; 12F).

(Tr. 21.)

Gore asserts that the ALJ erred by failing to give this opinion controlling weight, and did

not give good reasons for discounting it.  (Doc. No. 21 at 10-11.)  He argues that the ALJ's explanation that Gore's testimony and Function Report, which stated that he could do household tasks such as cooking, care for pets, drive, and traverse stairs, conflicted with Dr. Antalis' opinion is insufficient to qualify as a "good reason" for discounting the opinion because "the ALJ did not demonstrate that Mr. Gore could do any of these activities on a *regular and continuing* basis." (*Id*. at 11.)

The Commissioner responds that Social Security regulations provide that controlling weight is assigned to a treating physician's opinion if it is well-supported by clinical techniques and not inconsistent with other substantial evidence of record. (Doc. No. 23 at 10, citing 20 C.F.R. § 404.1527(c)(2).)  Here, the record contained conflicting evidence, and the ALJ properly gave the opinion "some weight" and incorporated those limitations which he judged consistent with the other substantial record evidence.  (*Id*.)

Gore's assertion that the ALJ is required to "demonstrate" the extent of Gore's impairment is mistaken.  Instead, as discussed *supra*, the ALJ must give "good reasons" for giving less than controlling weight to a treating physician's opinion, that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). Here, the ALJ has met that burden.  He clearly stated the weight given to the opinion, and cited specific evidence in explaining his reasoning.  The ALJ noted, and Gore does not dispute, that Gore testified that he was able to use stairs occasionally, including to move equipment down into the basement, and back upstairs in the spring, as well as to reach the cat litter down in the basement sometimes. (Doc. No. 23 at 11, citing Tr. 38-39.)  This is consistent with the ALJ's determination

22

that Gore could  "occasionally" climb ramps and stairs. (Tr. 19-20.)  Further, as the ALJ noted, the

assertion that Gore is unable to avoid "normal" hazards is inconsistent with his testimony that he can

"occasionally" drive sixteen miles down a four lane road to reach his local Walmart and navigate the

store independently, and qualify for a restricted driver's license.  (*Id*. at 39.) This testimony is

consistent with the ALJ's determination that Gore "can work with both large and small objects and

can avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, approaching

vehicles and people." (*Id*. at 24.)  The ALJ also adopted some of Dr. Antalis' proposed restrictions,

including restricting Gore from driving for work, operating heavy machinery, and avoiding "all

exposure to workplace hazards," which is equivalent to avoiding dangerous tasks. (*Id*.)  Therefore,

the ALJ did not err in his treatment of this opinion.

### iii.    May 2016 Opinion

On May 16, 2016, in a letter to the Ohio State Division of Disability Determination,  Dr.

Antalis explained that there had been "no real changes in [Gore's] disability status" since Dr.

Antalis' May 5, 2015 report, and opined that Gore had essentially almost completely lost vision in

his left eye because of advanced glaucoma, with "significant field loss in his better right eye," which

"made it so that he can no longer work as a truck driver." (*Id*. at 337.)

The ALJ addressed Dr Antalis' May 2016 letter as follows:

> Despite the fact that Dr. Antalis is a treating source, I do not give this opinion
> controlling weight as it opines on matters reserved to the commissioner.  I give
> this opinion some weight, as it was only partially consistent with the record.  The
> record demonstrated that the claimant's eft eye had significant impairments and
> his right eye had a reduced field of vision.  The opinion regarding heavy
> machinery is consistent with the opinion provided by the consultative medical
> examiner . . . . However, the claimant was able to manipulate both large and small
> objects and to operate a non-commercial motor vehicle.  He was able to read
> printed text ad text on a computer screen.  His corrected vision in his right eye was
> 20/20.

(*Id*. at 22) (internal citations omitted).

As discussed *supra,* under Social Security regulations, opinions on whether a claimant is disabled or unable to work are not medical opinions, and treating source opinions on these issues are not entitled to controlling weight, as these are matters reserved to the Commissioner.  *See* 20 C.F.R. § § 404.1527(d)(3); 416.927(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."); *see also Amir v. Comm'r of Soc. Sec*., 705 F. App'x 443, 448 (6th Cir. 2017) ( "[A] determination concerning whether a claimant is able to work is not a medical opinion "); *Andres v. Comm'r of Soc. Sec*., 733 F. App'x 241, 244 (6th Cir. 2018).  Rather, they are opinions on an issue reserved for the Commissioner and entitled to no special significance or deference.  *See Turner v. Comm'r of Soc. Sec.,* 381 F. App'x 488, 493 (6th Cir. 2010), *Bass v. McMahon,* 499 F.3d 506, 511 (6th Cir. 2008) ("[C]ontrolling weight will not be provided to a treating physician's opinion on an issue reserved to the Commissioner.").

To the extent that the May 2016 letter contains medical opinions, they reiterate the opinions set forth in Dr. Antalis' February 2016 opinion, which were addressed *supra*.  The ALJ properly explained his decision to give "some weight" to the May 2016 letter, and supported his decision with clearly articulated good reasons, including noting inconsistencies with the opinion of the consultative medical examiner and other substantial record evidence.  (Tr. 21-22.)  Therefore, the ALJ did not err in his treatment of this opinion.

### iv.    Substantial Evidence

Gore next asserts that, while the ALJ articulated "good reasons" for discounting the opinions discussed *supra*, these reasons are not supported by substantial evidence.  (Doc. No. 21 at

24

11.)  He points to a plethora of evidence in the record that he believes supports a more restrictive finding of residual functional capacity.  (*Id*. at 11-13.)

The Commissioner responds that the ALJ cited record evidence supporting his "good reasons" for not assigning controlling weight to Dr. Antalis's opinions. (Doc. No. 23 at 13.)  For example, the ALJ discussed and gave "significant weight" to the opinion from consultative examiner Dr. Fife and the state agency reviewing physicians, all three of whom recommended less severe restrictions than those advocated by Dr. Antalis, and the ALJ ultimately adopted greater restrictions than those advocated in the other doctors' opinions.  (*Id*. at 13-14.)

As the ALJ noted, Gore's activities of daily living, which included occasionally using the stairs at his home and non-commercial driving, did not support the conclusion that Gore could never use stairs and would be unable to avoid normal workplace hazards using the vision in his right eye. (Tr. 21.)  Further, the ALJ discussed at length the findings of consultative examiner Dr. Fife, who opined that he should not climb heights, operate heavy machinery or drive commercially. (Tr. 356.) He also discussed additional treatment records from October 2016, May 2017, and August 2018, indicating that Gore's condition was stable and improving.  (Tr. 22.)  He also discussed the state agency reviewing physicians' opinions, and adopted a finding of residual functional capacity which was more restrictive than any of these physicians had recommended, because it included a limitation of only "occasionally" using ramps and stairs.  (Tr. 23.)

Gore directs this Court's attention to several parts of the record which he believes supports Dr. Antalis' conclusion he was unable to work.  (Doc. No. 21 at 11-13.)  While Gore cites evidence from the record he believes supports a finding of disability, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different

conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  In this matter, the ALJ clearly articulated his reasons for discounting the conclusions of Dr. Antalis and those reasons are supported by substantial evidence.  Therefore, this assignment of error is without merit.

**B.      Second Assignment of Error: SSR 85-15**

In his second assignment of error, Gore asserts that the ALJ erred by failing to recognize that "Gore's background fits the narrow criteria necessary to find disability because of a vision impairment under SSR 85-15." (Doc. No. 21 at 14.)

The Commissioner responds that the ALJ accurately noted that Gore had "at least high school education" under Social Security regulations, as he completed twelfth grade. (Doc. No. 23 at 15, citing Tr. 24, 193.)  20 C.F.R. § 404.1564. (b)(3) defines "limited education" as a 7th to 11th grade level formal education.  He argues that Gore's reliance on the VE's testimony that a twelfth grade education did not give Gore a competitive advantage over similar individuals with an eleventh grade education is misplaced, because other aspects of his vocational profile reflected his ability to perform a significant number of other jobs . (*Id.*, citing Tr. 61-62.)

Under SSR 85-15, a claimant may be found to be disabled if they have a severe, medically-determinable impairment that prevent them from performing past relevant work. The rule for visual impairments is as follows:

> As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading

small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels. However, a finding of disability could be appropriate in the relatively few instances in which the claimant's vocational profile is extremely adverse, e.g., [(1)] closely approaching retirement age, [(2)] limited education or less, [(3)] unskilled or no transferable skills, and [(4)] essentially a lifetime commitment to a field of work in which good vision is essential.

SSR 85-15.

Although Gore acknowledges that he has "at least a high school education" under Social Security regulations, he asserts that the ALJ should have found that he met the "limited education or less" requirement of SSR 85-15 based on the VE's testimony that there was no vocational advantage between a person with an eleventh grade education as opposed to a twelfth grade education when considering a hypothetical person of Mr. Gore's background and impairments. (Doc. No. 21 at 14, citing Tr. 63-64.) In making this argument, he overlooks the significance of the VE's other testimony, which stated that hundreds of thousands of jobs remained in the national economy that someone with Gore's vocational profile and the residual functional capacity determined by the ALJ could perform. (Tr. 24-25.) The ALJ properly relied on the VE's testimony in determining that Gore was not disabled because he could make a successful adjustment to perform a significant number of other jobs in the national economy.

This assignment of error asks the Court to re-weigh evidence properly considered by the ALJ. This is beyond this Court's authority. *Brainard*, 889 F.2d at 681 ("Judicial review of the Secretary's decision is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards in reaching her conclusion. . . . We do not. . . weigh the evidence"). Because the ALJ supported his conclusion with

substantial evidence, this assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final

decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 1, 2020

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.   28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**